**RYAN G. WELDON**
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT 59403
119 First Ave. North, Suite 300
Great Falls, MT 59403
Phone: (406) 761-7715
FAX: (406) 453-9973
E-mail: Ryan.Weldon@usdoj.gov


**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> Plaintiff, <br><br> vs. <br><br> **BRANDON RAY BUCKLES,** <br><br> Defendant. | **CR 15-01-GF-BMM** <br><br><br> **TRIAL BRIEF OF THE UNITED STATES** |

1

## ANTICIPATED PROOF

### A. The Rape

On June 26, 2010, Jane Doe[1] was with Brandon Buckles and her boyfriend, Rick Morales. Others were present as well. Jane ultimately went to bed with her boyfriend, and she awoke to Buckles on top of her. Jane was naked, although she went to bed clothed, and Buckles' penis was inside her vagina. Jane started screaming and hitting Buckles, but she could not fight him off. Nor did Jane's boyfriend aid in rescuing her—he was highly intoxicated and unconscious to the world. Buckles finished with Jane and left the residence. Jane called her family members and immediately went to the hospital.

Judy Lauridsen conducted a sexual assault kit at the hospital. Lauridsen noted that Jane was "quite upset" and was "crying off and on" throughout the kit. Lauridsen stated that Jane had pain in her vaginal area, and there was bleeding. Lauridsen also noted a mark in Jane's vaginal area that could be a bruise.

### B. The Investigation Begins

The FBI interviewed Buckles, who stated that he woke up on a couch at Jane's house at 4:30 p.m. Buckles stated that he could not find his cell phone, and when he looked in the bedroom, he saw Rick Morales and Jane sleeping in bed together.

---

[1] For the privacy of the victim and ease of reading, the United States is referring to the victim as "Jane Doe," which is not the victim's true name.

Buckles stated that Jane was naked from the waist down.  Buckles claimed that he never touched Jane.  Instead, he was a complete gentleman, deciding only to grab a blanket to cover up Jane's nude body.  Buckles then kicked the bed to ask Jane where his phone was located.  According to Buckles, Jane awoke and told him to get out or she was calling the police.  Buckles told a federal agent that he never had sexual contact with Jane during the time of the rape, and he left after looking for his phone.

On October 7, 2014, federal agents re-interviewed Buckles.  Buckles read the FBI report detailing his first interview.  Buckles reaffirmed to another federal agent that he never touched Jane, sexually or in any other inappropriate way.

### C. The DNA Evidence

Dr. Charity Davis conducted the analysis of the DNA in this case.  Semen was identified on Jane's panties and vaginal swab.  DNA testing is a test of exclusion, meaning the FBI Crime Lab was trying to exclude Buckles from the semen stain on Jane's panties.  Dr. Davis could not exclude Buckles because his DNA was a match.  Dr. Davis can exclude at least 99.99% of the rest of the world from the semen stain, but she cannot exclude Buckles.

Law enforcement also obtained a swab from Buckles' penis.  Jane was a match to the DNA found on Buckles' penis.  Dr. Davis, the same as above, was trying to exclude Jane from the DNA found on Buckles' penis.  Dr. Davis cannot do

so, but she can exclude at least 99.99% of the rest of the world.

Buckles realized the DNA evidence in this case is problematic. He therefore claimed that the DNA sample on Jane's panties must be from Jane's boyfriend. The United States tested the panties, and Jane's boyfriend was excluded from the semen stain. Not to be outdone, Buckles claimed that he had consensual sex with Jane's sister prior to the rape of Jane. He argued that the DNA on his penis was not from Jane—it was from Jane's sister. The United States tested this theory as well. The results showed that two or more DNA profiles, foreign to Buckles, were present on Buckles' penis swab—one was a match to Jane, as outlined above, and for the second there was insufficient information to determine whether Jane's sister was a match or not. Dr. Davis will explain that she was unable to determine whether the second DNA profile either matched or excluded Jane's sister because there was not a sufficient sample of the additional DNA profile. This could have been for a multitude of reasons, including that the second DNA profile was rubbed off during the rape of Jane.

## THE PLEA

The United States of America, by and through its counsel, Ryan G. Weldon, notifies the Court and opposing counsel that, though the Defendant is proceeding to trial, the United States notes for the record that a motion for change of plea would have been more beneficial to the Defendant than a conviction following

trial. The Defendant nevertheless proceeds to trial. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## LENGTH OF TRIAL AND NUMBER OF WITNESSES

The United States anticipates calling approximately 12 witnesses. The trial should last no more than 2 days.

## EXHIBITS

1. Tribal Enrollment Certificate

2. Federal Register

3. Victim's panties

4. Vaginal swab

5. Penis swab

6. Buccal samples from known individuals

7. Audio Recording of Defendant

## LEGAL ISSUES

**A. Jane's statements to medical professionals are admissible hearsay.**

The United States will present evidence from the medical professionals who conducted the sexual assault kit on Jane. The medical professionals will testify as to their observations and treatment provided. Pursuant to Fed. Rule Evid. 803(4),

the medical professionals will also testify about statements that Jane made for medical diagnosis and treatment.

The rule admits any statement that "is made for—and is reasonably pertinent to—medical diagnosis or treatment." Fed. R. Evid. 803(4). A statement for medical reasons, "where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility . . . ." *White v. Ill*, 502 U.S. 346, 356 (1992); *see also U.S. v. Bercier*, 506 F.3d 625, 631-633 (8th Cir. 2007).

The Ninth Circuit has specifically approved of admitting statements about forced sex if needed for treatment. *United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008) (recognizing statements needed for treatment because "[i]t would have been unprofessional . . . to have treated [the victim] without eliciting an account of what happened to her").

### B. Rule 412 protects rape victims and their privacy.

Buckles filed a motion to argue that the DNA evidence on Jane's panties is from Jane's boyfriend, not from Buckles. (Doc. 35). The United States has conceded that this argument is admissible, even if directly refuted by the physical evidence and additional DNA testing. (Doc. 49). No other evidence is admissible due to the strictures of Rule 412. For example, Rule 412 broadly excludes any previous sexual activity of a victim:

6

**(a)** **Prohibited uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

(1) evidence offered to prove that a victim engaged in other sexual behavior; or

(2) evidence offered to prove a victim's sexual predisposition.

Fed. R. Evid. 412(a). But there are always exceptions to the rule in criminal cases. Fed. R. Evid. 412(b). For example, district courts may admit evidence in the following three situations:

1. evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of the semen, injury, or physical evidence;

2. evidence of specific instances of a vicitim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and,

3. evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b). Admission of the above exceptions is not automatic. *See, e.g., United States v. Torres*, 937 F.2d 1469, 1472-1474 (9th Cir. 1991). For example, before any evidence addressing the victim's sexual behavior may be admitted, the defendant must file a motion that "specifically describes the evidence." Fed. R. Evid. 412(c)(1)(A). This motion must be done "at least 14

days before trial unless the court, for good cause, sets a different time." Fed. R. Evid. 412(c)(1)(B). The time constraints exist to ensure that the victim is part of the process and informed of the evidence that will be used to invade her privacy. *See* Fed. R. Evid. 412(c)(1)(D).

Congress approved of these procedural and substantive rules because rape victims were treated unfairly by the criminal justice system:

> Too often in this country victims of rape are humiliated and harassed when they report and prosecute the rape. Bullied and cross-examined about their prior sexual experiences, many [victims] find the trial almost as degrading as the rape itself.

*Congressional Discussion*, Fed. R. Evid. 412. Protecting the victim will also help encourage others to step forward in criminal prosecutions:

> The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate details and the infusion of sexual innuendo into the factfinding process. *By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.*

*Advisory Committee Notes (1994 Amendments)*, Fed. R. Evid. 412 (emphasis added).

Buckles has identified that he wants to discuss a previous sexual encounter between Jane and her boyfriend. He likewise wants to explain that Jane was in the same bed as her boyfriend when she was raped. Given that Buckles has

followed the proper process under Rule 412(c), these instances are admissible.

But no other evidence involving Jane's sexual activity is admissible at trial.

DATED this 19th day of May, 2015.

                                        MICHAEL W. COTTER
                                      United States Attorney


                                      */s/ Ryan G. Weldon*
                                      RYAN G. WELDON
                                      Assistant U. S. Attorney

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule, this certifies that the body of the attached trial brief contains 1,664 words, excluding the caption and certificate of compliance.

                MICHAEL W. COTTER
                United States Attorney

                */s/ Ryan G. Weldon*
                RYAN G. WELDON
                Assistant U. S. Attorney